Mr. Murdoch, whenever you're ready Thank you very much. May it please the court, my name is John Murdoch. I'm here on behalf of Chapman Law Firm. We have two issues before us. We are appealing the decision of the court with regard to a finding in favor of the government on a counterclaim under the special plea and fraud and with regard to finding of false Claims Act violations as to four claims. We believe it was clear error on the part of the court to find that the claims that were submitted were false and we believe it was clear error because the court's finding was based upon a conclusion that certain inspection documents were false and that therefore the claims themselves were false. As was pointed out in Alcatech, in order to succeed on a special plea and fraud, it's the government's responsibility to establish by clear and convincing evidence that the contractor knew that its submitted claims were false and that it intended to defraud the government by submitting those claims. So the essence of the government's obligation is to show that the claims were in fact false. If you're supposed to be doing inspections and you say when you're mowing the lawn that you did an inspection, isn't that clearly false? The statement itself may be false, but the question is whether or not the claims submitted were false. If the claims submitted were false, the fact that there may have been underlying documents that were not related to the validity of the claim that were false becomes irrelevant and here's the reason why. There are five reasons that these claims were not false. First of all, the invoices that were submitted pursuant to the contract were aggregate invoices for a bundle of properties and for those properties a bundle of 18 different services. That's what was billed for. One of a subset of the 18 different services was for the performance of inspections on the property. No evidence was introduced into evidence nor did the government ever claim that Chapman Law Firm did not perform any of the other 8 to 17 different requirements. So is this the 80% rule? Is this the argument that you make? So is it really your position that you could have hypothetically lied about performance regarding 20% of the side of the scope of the statute because there was an 80% requirement for performance? Is that your position? No, and that would be a cynical approach for that to be our position, Your Honor. The position that we're taking is that the question here is whether or not the claim submitted was false. Clearly there was an issue about the quality of the services and the government's issues with regard to the inspection reports goes to whether or not the services being provided were qualitatively good. But if pursuant to the invoices and the way the contract is structured, I'm permitted to bill even in circumstances where I know I didn't do something. And that's what's important here, is the way these invoices were structured under the contract, a contractor could knowingly bill for a service, note for the invoices, knowing that it had not performed all of the services under the contract. As the record showed, only four properties were identified, or four claims were identified. The record showed that in fact Chapman Law Firm had performed inspections on those four properties. It just had not performed all of the inspections. And there was no provision in the way that invoicing was done to be able to demonstrate that I missed an inspection in this particular month. So as long as the contractor's performing some of the services, and in this case even some of the inspections, it was permitted to bill. And those invoices were therefore not false. Now... Didn't you get an unacceptable rating for month after month after month? They did receive some unacceptable ratings. That again goes to whether or not the quality of the services was appropriate. It doesn't go to whether or not the claims themselves are false. So a claim submitted for the performance of say 17 out of the 18 services is perfectly valid and true. The fact that there's a qualitative dispute over a consistent failure, as the government claimed, to perform one of the 18, doesn't make the submission of the claim false. And that's why it was so important to bring up the issue of the BMY case and Alcatech. In Alcatech, the contractor was responsible for a line item bill on property inspections. That was a line item. So clearly it would have been a false claim for that contractor to submit a bill for property inspections. Similarly, in the BMY case, the court contrasted two different forms of the contract that the contractor had. In the first form of the contract, the contractor had to perform inspections on one out of every 30 of the units built. In the second contract, they had to expect 100%. As the court noted, if there's an obligation to do 100%, then a representation that you've done something that you didn't do would be false. But here, the government structured its contract in such a way that a legitimate bill could be submitted where I did 17 out of the 18 things that required. So I guess I'm back to what you referred to as a cynical point. Is it your position that because there was an 80% requirement that you could submit false documentation for a certain performance of duty as long as it was over and above the 80% that you required? Absolutely not, Your Honor. You could not do that. But again, going back to what the court found, the court found four false claims with regard to four properties. And with regard to those in fact performed some of the inspections. So at that point, it then becomes an issue of why should the government be allowed to suggest that the invoices were for 100% performance, when in fact they weren't, given that clearly they put on no evidence and made no allegation that the other 17 of the 18 services weren't performed. And there was evidence that inspections had been performed to some extent on the properties that were at issue. So again, it doesn't make the claims false. It raises issues about performance. And if you look at the record, the record clearly showed that the purpose of the underlying documents, the inspection reports, did not go to the issue of entitlement to payment. It went to the issue of whether or not there were qualitative issues. It was the government's tool for examining whether or not it felt that the services were being performed at the level and in the way that it wanted it performed. But it didn't go to the question of whether or not your bill was submitted properly. In fact, doesn't entitlement to payment depend on adequacy of performance? It doesn't depend on the quality where there is a bundle of items and the qualitative issue relates to only one item. Again, it's how the government chose to structure the invoices, one can argue that they should have structured them the way they were structured in the Alcatex situation, but they didn't do that. They didn't line item. Moreover, invoices were due at the beginning of the month before services were to be delivered. And as was repeatedly pointed out in the record, when the government raised issues about the inspection reports, it never raised issues about entitlement to payment or suggested at any point in time that the contractor was not entitled to be paid given that it performed at the other services. The issue the government raised was this goes to the issues of the quality. And the government has other tools available to it besides the special plea and fraud, which is not intended to address all fraud. It's intended only to address issues having to do with whether or not the underlying documents that are fraudulent go to the proof establishment allowance or statement of the claim. And what's clear from the record is that is not what the purpose of those documents were. Can I just ask you a sort of a technical question, just the money at stake here, what the claim is. The original contract was, and I assume these numbers are not confidential, right? The original claim was for $35 million and you were suing for $19. Was that a portion of the $35 million that you were not paid or was that over and above $35 million? These were a combination of equitable adjustment claims and claims having to do with breach of the contract. And I believe by the end it was about two and a half, $2.2 million that was at issue on the claims that have now been barred by the special plea and fraud. And was that a portion of the $35 million of the original contract or did that go to your future, you're getting the one up here? It did not go to the, at the end, the $2.2 million I believe did not go to the one up here. It went to costs that were incurred because of delays in the contract. And were you seeking any compensation or anything with regard to the fact that the government didn't renew? I believe originally there was in the underlying case that there was a claim for the non-renewal period. So, again, given that the, it's our position that the government's position that the claims were false is an overreach. Clearly, yes, there were issues with regard to the quality of services. There were other means to address that, but the special plea and fraud was not one of those. The, with regard to the False Claims Act, again, as to all four of the claims, it's our position that the False Claims Act finding was incorrect because the claims themselves are false. 17 of the bundle of 18 services had been performed, inspections had been performed in some instances on those four properties. If the claims aren't false, the False Claims Act doesn't apply. We made that point in a footnote in our original brief that that would apply to all four of the claims. We did also point out that with regard to two of the claims, that based upon the sequence of events, the contractor had no knowledge at the time that it submitted the claims that the service of inspections had not yet been performed. And with that, unless you have further questions, I'll reserve my time. Thank you. Ms. Moore? Good morning, Your Honors. May it please the Court, the trial court's judgment should be affirmed under both a special plea and fraud statute and the False Claims Act. The trial court found as fact that Chapman fabricated fraudulent routine inspection reports, also known as bimonthly inspections or BMIs, that Chapman knew the reports were fraudulent and that by submitting them to HUD, Chapman intended to deceive HUD. Chapman does not dispute this, nor does Chapman contest that Mr. Chapman directed John Goss, Vice President of Operations, to wipe them all, ASAP, referring to the creation dates of all routine inspection reports in Chapman's electronic monitoring system. Indeed, after that, all routine inspection reports had a creation date of January 1st, 2000, years before Chapman was even awarded this contract. In this regard, the trial court found that Chapman engaged in a widespread, pervasive pattern in practice of fraudulently conducting fraudulence, culminating in the intentional falsification of document creation dates, so that HUD could not see that Chapman failed to routinely inspect HUD properties entrusted to Chapman's care. Chapman argues instead that there was no connection between the submission of routine inspection reports and the payment of invoices. Chapman is mistaken. The contract in Section B-7 states the contractor shall be paid a fixed fee per HUD-owned property for all requirements of Section C-5.1, C-5-2, and C-5-3. Section G-2 also states that Chapman shall be paid by performing all contract requirements. Section C, the performance work statement, at paragraph 5.3.32, states that the contractor shall routinely inspect and take all actions necessary to preserve, protect, and maintain each property. Moreover, Chapman's own... But if I understand the system, if he only performs 80%, he's entitled to all of the, whatever the award is for the contract, right? Your Honor, that is not correct. That's Chapman's argument. Instead, the contract requires that payment is for performance of all of the contract requirements. The contract states all in these areas that I've mentioned. So what is 80% about? The 80% is an evaluation criteria. That is a part of the contract that allows the government to evaluate Chapman's performance. The 80% is based on a qualitative evaluation of the condition of the homes that were inspected by a subcontractor, special property inspection subcontractor. That subcontractor inspected various homes quarterly and determined the condition of the homes. It was a qualitative analysis. It was not quantitative. It had nothing to do with how many of the inspections Chapman had conducted or other property tasks, how many Chapman had done of those. It had nothing to do with the number of inspections Chapman conducted or any other tasks. It was simply... If he's supposed to do 100 inspections a month, he's got to do the 100 inspections a month. But only 80% of them have to be shown to have been done properly or adequately? No, Your Honor. It's not a quantitative analysis. 80 out of 100 homes must be done adequately. It's a purely qualitative analysis as set forth in the contract. The contract requires that the evaluation is based on the results of the special property inspections, which look at the condition of the homes for health and safety violations as well as general appearance. So it's purely qualitative. And it's a way to evaluate Chapman's performance. It has nothing to do with payment of Chapman, payment to Chapman. That, according to the contract, in at least two sections, plus paragraph 5.3.3, states that Chapman must conduct the inspections in order to get paid. Moreover, Chapman's own property management plan, drafted by Chapman and incorporated into the contract, stated that routine inspections would be conducted every 15 days of each home to ensure that they were preserved and protected. This was Chapman's requirement incorporated into the contract. The trial court recognized that the contract tied payments directly to the property management work, including the routine inspections. The court stated, the contract directly tied payment to performance and plaintiff was entitled to a management fee for each property only if it timely conducted routine inspections. That's on page 68 of the trial court's opinion. The trial court also found that plaintiff's representation that it had conducted routine inspections was material to defendant's obligation to pay plaintiffs, material to plaintiff's claim of entitlement to a management fee, and was an essential, important, and pertinent part of plaintiff's claim. This was based on the government contractor technical representatives continually stressing to Chapman the importance that it inspect these homes routinely, timely, every two weeks to ensure their safety and to ensure their condition so they could later be returned. So Chapman's argument that it only had to perform 80% of the work is completely erroneous and it would violate the contract requirements and did. The court's finding that the inspection reports were backup documents or proof in support of Chapman's invoices was not clearly erroneous. The backup documents as an Alcatech consisted of the inspection reports. The court quoted Alcatech in its opinion. Chapman contends that this case is not similar to Alcatech simply because the inspection reports in this case did not have a separate line item, one, and two, because they were not physically attached to the contractor's invoices. Well, in this case, there were more than 8,000 properties at times. There were many thousands of reports, not simply inspection reports, but termite inspection reports, other lead inspection, all sorts of reports and all sorts of documentation for each home indicating that Chapman was performing the contract. It would have been impractical, if not impossible, to attach physically and hard copy every single report that showed that Chapman was performing the contract. Instead, the contract required that Chapman use an electronic monitoring system, which was a website that Chapman posted all of its performance documentation on that website. And so any difference between this case and Alcatech is procedural. It's not substantive. The notion that because the inspection reports were not a separate line item on their own is also erroneous. Line item one, clin one, was titled property management, and Chapman received a fee of $2,200 for each property. This contract was worth $35 million, and the property management tasks in section 5.3.3.2 specifically said that Chapman must inspect the homes to keep them safe. Again, Chapman's property management plan said that they would inspect them every 15 days. That was part of the contract and drafted by Chapman. Okay, so at least on the false claims, as I understand your friend's argument, at least with respect to two of the properties, what he says is there was no knowing false claim, because when they submitted the initial material that was before the false, they knew about the false invoices having been filed. Why isn't that sufficient to establish that there was not sufficient proof of false claims, at least with respect to those two properties? With respect to the false... Oh, I'm sorry, Your Honor. Do you know which ones I'm talking about? Yes, with respect to the False Claims Act. Yes, the Trenton Street property and the Eastdale Avenue property were both properties that... The false information, the fraudulent inspection reports were filed subsequently, right? Well, first, they knew that they had not submitted inspections as required, because again, Chapman was in control of its own EMS, Electronic Monitoring System. So there were gaps. They were missing bimonthly inspections on that EMS that Chapman hadn't done. So the fact that there were records in support of the false invoice doesn't negate the fact that the invoices for the four properties that Chapman had not performed their routine inspections were still false invoices. They were still false. What Chapman's talking about is a record in support of an invoice. That's another way to find a false claim. In that case, again, a record in support of an invoice, there's no case law that says that for a record in support of an invoice to be a violation of the False Claims Act, that that record must be dated before the date of the invoice. It's still in support of an invoice, whether it was created before the invoice, on the day of the invoice, or after the invoice. It's still created in support of the invoice. So under two areas of the False Claims Act, the invoices themselves were false because Chapman hadn't conducted the routine inspections when it submitted the invoices. And then the record in support of the invoice for the Trenton Street and Eastdale Avenue properties that were created after the fourth installment payment was made are still false records in support of an invoice. So either way, the False Claims Act does apply to all four properties. As with a special plan fraud, Chapman concedes it's fraudulent conduct, and the court did not err in finding Chapman liable under the False Claims Act. Clearly, also, the court did not err in finding and holding Chapman's claims forfeited under the special plan fraud. For these reasons, we request that the court affirm the judgment of the Court of Federal Claims. A few points, Your Honor. Let me begin with the response to your question about the 80% and point directly to the record. At Appendix 484, the property management performance requirements summary. Among them is a requirement summary for CLIN 5.3.3, which included property maintenance. Property maintenance included property being ready to show condition. It included inspections, and it included quality assurance. Under the performance requirements summary, it states, properties are maintained in clean, safe, sanitary condition. Performance measure. Average score of all SBI inspections are completed during period. In fact, this was a measure of the performance of completed inspections. This goes directly to our point. There was no requirement that 100% of the inspections be performed in order to validly submit a claim to be paid for the bundle of services that were being In fact, the reason the position the government is taking doesn't even make sense is its own statement as to the volume of properties as well as the volume of services that had to be performed. If one accepts the government's position, had a contractor failed to do any of the myriad things that was required to do under this contract in a month on a house, it would therefore have violated the False Claims Act, but failed to do anything. And that doesn't really make any sense. This clearly says they were looking to see your performance of all, your performance of the individual inspections. It was not simply some generalized 80%. So that is clearly not true. The government's argument also results in this contention that if any, the government's position essentially is if any underlying, any document that the contractor has, and the government's even said the contractor had to maintain many, many, many types of reports. It's not the case that every document that the contractor's required to maintain necessarily relates to and is part of the proof establishment allowance of a claim. Some are, and some aren't. And what's clear from the record is those inspection reports were not part of the proof establishment of a claim. With that, Your Honor, I thank you. Thank you. We thank both counsel and the cases.